UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

RAYMOND D. GRAVES, SABRINA
A. PETERSON, and ROBIN A.
WILLIAMS,

      Plaintiffs,

v.                                                          CASE NO.  8:06-CV-1830-T-MAP

MORSE OPERATIONS, INC., a
Florida corporation d/b/a ED MORSE
CADILLAC, TAMPA,

      Defendant.
_____/

## ORDER

This is an action charging racial and gender discrimination in the workplace. Plaintiffs Sabrina Peterson and Robin Williams, African–American females who worked for Ed Morse Cadillac for 81 days and just over one month respectively, claim Ed Morse subjected them to disparate treatment and constructively discharged them and because of their race and gender.[1]  Ed Morse, on the other hand, asserts Peterson resigned after complaining of being treated rudely by its general manager and about being unable to keep up with the hours she was expected to work, and Williams, who claimed other salespersons were treated preferentially, resigned because she was unable to earn enough money. In its motion for summary judgment, Morse argues Peterson and Williams cannot make out *prima facie* cases and, alternatively, that it had no notice of any objectionable conduct. (doc. 24). After reviewing the summary judgment record, I agree and grant

---

[1] The Plaintiffs stipulate to the dismissal of their claims for racial and sexual harassment and for retaliation. *See* doc. 35, p. 1, n.1.  The other named Plaintiff, Raymond Graves, resolved his claim through mediation.

Morse's motion.[2]

   *A. Standard of Review*

Motions for summary judgment should only be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) (emphasis in original). The substantive law applicable to the claimed causes of action will identify which facts are material. *Id.* Throughout this analysis, the judge must examine the evidence in the light most favorable to the non-movant

   *B. Background*

The material facts are not particularly in dispute. Both Peterson and Williams worked as car sales associates for Morse for a brief time, Peterson from February 2, 2006 through April 24, 2006, and Williams from March 1, 2006 through April 15, 2006. The facts forming the basis of each Plaintiff's claim, in the light most favorable to the Plaintiffs, are set forth below.

   *1. Sabrina A. Peterson*

Steve Barger, the general manager for Morse, hired Peterson as a sales associate on or about January 16, 2006. Peterson started work on February 2, 2006, and spent the majority of February 2006 in training. She participated in Morse's mentoring program, and was assigned to assist two experienced salespersons who would mentor her. Peterson complains that one of her mentors, Scott

---

[2] The parties consented to my jurisdiction pursuant to 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73. (doc. 5).

Olds, unfairly received half of the commission on one sale rather than the usual $100 mentor share, and her other mentor, Ed Marquardt got credit for completing a sale for her while she was in a training class. In particular, with regard to Olds, Peterson claims she was working with a customer, McElwee, and that Olds, should have only received a $100 commission for assisting her with the sale to McElwee. At her deposition, Peterson acknowledged receiving 25% of the gross sale as her commission on the McElwee sale, and although she repeatedly stated that Olds received half of the commission for the sale, she did not produce any documents showing Olds received any commission nor any evidence explaining why Olds should only have received a $100 commission as her mentor (Peterson deposition, doc. 29, exhibit 2). Similarly, with regard to her other mentor, Peterson recalls working with a customer and the customer said he did not have the time to stay to complete the sale. The customer told Peterson that as long as the pricing was right, he would come back the next day. Because Peterson knew she would be in a training program the next day with Chip Thomas, however, she arranged for Marquardt to finish the deal. When the deal was done, Jeff Litton, general sales manager, told Marquardt that Peterson did not deserve the deal and that he should take it as his own. In the end, Marquardt paid Peterson one-half his commission, however, Peterson concluded she was denied the commission because she is black and female (doc. 29, p. 125). She claims the commission was unfairly given to Marquardt as she had spent an hour and a half with the customer and was hurt by Litton's comment that she did not deserve the commission, but she did not speak to Litton about it (doc. 29, p. 122-125).

     Aside from these two incidents involving mentor assisted sales, Peterson complains about management Mark Lewkewicz's refusal to accept turnovers to management ("TOs") several times. On her second day selling, a customer, Alex, wanted to purchase a particular Escalade and Lewkewicz refused to assist her in locating the Escalade for the customer (doc. 29, pp. 105-107).

3

Lewkewicz recognized Alex as a repeat customer of another salesperson, "Mark from used car sales," and called "Mark from used car sales" to meet with Alex. Both "Mark from used car sales" and Peterson showed the couple around, but Alex left the dealership without buying a car that day. Peterson believes Alex purchased a car later that month, and that the sale should not have been taken from her (doc. 29, pp. 108-112).

Although Peterson said no other deals were taken from her, she complains of lost deals due to Morse's refusal to help to her (doc, 29, p. 157). She contends Morse management made no effort to locate cars for her customers and was willing to sacrifice car sales of up to $85,000 in order to get her to quit (doc. 29, p. 166). In contrast, she says management special ordered cars for other salespersons' customers (doc. 29, p. 177). Specifically, Peterson recalls a couple from Saddlebrook who wanted to buy a fully loaded black Escalade and Lewkewicz refused to look for such a car for her (doc. 29, p. 158-160). Peterson followed up with the Saddlebrook couple and advised them when the dealership received a black Escalade, but they ended up buying the car from another dealership (doc. 29, p. 165). When asked why Lewkewicz, who would have earned money from the sale, was not willing to look for the Escalade she testified that "maybe its my race" (doc. 29, p. 107). She says "I'm an honest person, I treat everybody with respect, I don't know what other reason [aside from race] there could have been" (doc. 29, p. 107). Another incident she described involved a pastor from West Palm Beach who wanted to buy an Escalade and Litton told the pastor that they did not have a vehicle like he wanted, but Peterson would stay in contact with him (doc. 29, p. 168). While complaining that Litton did not want to help her with the sale, she admits that she stayed in contact with the pastor and sold him a car two weeks later (doc. 29, p. 172).

Peterson testified that she complained to management about these incidents, but never mentioned race or gender; she was generally unable to recall when or where her conversations took

4

place or even the gist of the conversations (doc. 29, pp. 139, 186). She further complains that Barger told her she was not allowed to speak or talk to Williams (doc. 29, p. 117, 204), and not to go out for breakfast after clocking into work in the morning (doc. 29, p. 196), and that Litton goes all out for caucasian male salespersons (doc. 29, p. 126). She believes that the male salespersons were not subject to these same prohibitions because she had seen them clock in and then go get breakfast and males talking together during the day too. And, although Peterson complains that management "goes all out" for males, during her deposition she mentioned only the incidents described above.

Notwithstanding the facts that her discrimination charge and this lawsuit rest on allegations that Morse discriminated against her on the basis of her race and gender, and that she testified that the "final straw" causing her resignation was when Barger told her not to socialize with Williams (doc. 29, p. 204), several times during her deposition Peterson admitted otherwise. She testified that at the time of her resignation she had not worked for two days and she called Babs McCarron, HR manager, because "[she] could not take it anymore" because "everybody knew something about everything around there" (doc. 29, p. 206-207). And, McCarron's notes made after speaking with Peterson confirm this. McCarron's note dated April 28, 2006, states:

> A couple of days ago Sabrina Peterson called to let me know she had left work with no intention of coming back, but now she was thinking about coming back and speaking with Jeff Litton. She felt she had been treated rudely by Steve Barger. He had spoken to her regarding her eating breakfast at work. However, she never showed up to speak with Jeff. Then this morning she called me to let me know that she was definitely not coming back and she had left a message for Marc Lewkoweiz letting him know. She told me that when she was hired on that she would have off two days a week and work from 40-42 hours per week, but that they had her working many more hours than that and she could no longer keep up with those hours, so she was putting in her resignation.

Doc. 29, exhibit 5. When questioned about McCarron's note, Peterson became upset and accused McCarron of not telling the truth (doc. 29, p. 210). Peterson testified that when she spoke to

5

McCarron, McCarron encouraged her to "come back in and put everything in writing and talk to Jimmy [Litton]," however Peterson never did so. Instead, she admits she never complained to McCarron that she was discriminated on the basis of race or gender and that she left a voice message for Lewkewics because Litton was not working that day, explaining simply that "this place was untolerable" (doc. 29, pp. 208, 221-222).

        *2. Robin A. Williams*

When Williams interviewed with Litton, he told her "specifically that he was looking to get some good, strong women on the sales floor" (Williams deposition, doc. 25, p. 32). About two weeks after she began work, however, "people started just acting a little different" (doc. 25, p. 63). Just as Peterson, Williams complains that she was instructed to tell a sales manager before leaving for lunch. She admits, however, that the rationale for this policy was "you guys are women and we want to make sure you're safe" (doc. 25, p. 65), and recalls an announcement made at a sales meeting requiring all salespersons to tell a manager before going to lunch (doc. 25, p. 69). Like Peterson, Williams complains that Barger asked that she not speak to Peterson at work. Williams testified that after seeing her and Peterson sitting outside together, Barger said, "look what happens when you get women together, you know, I gotta go break this up" (doc. 25, p. 70). Peterson and Williams were called into the office and told "you two don't need to talk, you can't sell each other a car" (doc. 25, p. 106). Like Peterson, Williams stated that male employees were not prohibited from communicating with each other (doc. 25, p. 71), and that she was told not to go to lunch with Peterson (doc, 25, p. 95).

Williams complains about a problematic co-worker at Morse. She states that she was called "girl" by Rich Richie, another salesman (doc. 25, p. 80), and that after she made a sale, Richie told her that according to the system the salesmen had among themselves, the customer should have

6

belonged to someone else (doc. 25, p. 81). She said he "threatened" her that if she was ever on the lot talking on her phone, he would stand next to her (doc. 25, p. 81). Williams reported this "threat" to management, and Richie did not bother her again (doc. 25, p. 194), and testified that she never formally complained to management about being called "girl" (doc. 25, p. 135).

She also complains that she was accused of taking a company car without permission. Williams says that on one of her days off, Litton called her and questioned her about using a company car. She said that Litton was trying to locate a missing vehicle, and although she admits that she did not know whether Litton also called other employees (doc. 25, p. 168), she assumed that she was a suspect because of her race (doc. 25, p. 167). Williams stated that it appeared that white salespeople did not have to ask permission to take company cars, while African American salespeople did (doc. 25, p. 144). She observed Giorgino take cars home daily, but conceded that he had standing permission to do so (doc. 25, p. 145), and said other employees told her they didn't have to ask permission to take cars, but conceded that they might have been saying that to impress her (doc. 25, p. 147).

Like Peterson, Williams claims that Morse generally failed to support her. She states that she asked about ten times for the "orphan list," a list of former customers no longer associated with a current salesperson, and that Morse did not provide it to her until the day before she resigned (doc. 25, p. 137). Williams also was troubled that Morse suggested she advertise in an African American newspaper (doc. 25, pp. 91–92), and recalls that another salesman "Matt" appeared to receive more favorable treatment (doc. 25, p. 137). But even Williams recognized a reason having nothing to do with race or gender as to why Matt may have received more assistance: Matt was Jeff's son's best friend and good friends with Jeff's family (doc. 25, pp. 76, 78).

The day she resigned, Williams was written up for coming in late. She called being written

up "the last straw," but admits she had already decided to quit and had packed up her belongings the day before (doc. 25, pp. 148–49). She claimed that other employees were not written up for being late, but the only example she gave was seeing an employee arrive 30 minutes late without getting written up; she was unaware if he had permission to be tardy (doc. 25, p. 151). When Williams resigned, she said it was because she was not making enough money, and like Peterson, she did not raise the issue of race or gender (doc. 25, p. 152).

    *C. Discussion*

        *1. constructive discharge*

A constructive discharge occurs when a discriminatory employer imposes working conditions that are "so intolerable that a reasonable person in the employee's position would have been compelled to resign." *Fitz v. Pugmire Lincoln-Mercury, Inc.*, 348 F.3d 974, 977 (11th Cir. 2003). The threshold for a claim of constructive discharge is "quite high." *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001). Here, Peterson and Williams claim Morse did not provide them with the help they needed to succeed as car salespersons, making the job so hard so they would quit (doc. 29, p. 103). The question, however, is not whether Peterson and Williams, from their own views, were forced to resign, but whether a reasonable juror could conclude that the working conditions endured by Peterson and Williams were so intolerable as to compel a reasonable person to resign. I am not persuaded that they were.

In sum, Peterson points to the following: "unfair" commissions shared with other salespersons who assisted in several of her very first car sales, "jokes" about blacks that she found offensive but never told anyone so, a "lost" sale that occurred when a customer decided not to buy from Defendant's dealership, and a "lost" customer to a salesperson who had sold the customer another car. Williams' claim centers on the following: not getting as much support as "Matt"; being called

8

"girl" rather than her name (which she never formally complained about); acrimony with another salesman when she made a sale to a customer he claimed belonged to someone else; having to ask permission before taking company cars off the premises; and being written up for tardiness (although it is questionable whether this should be considered, because Williams also said she made the decision to resign before she was written up). Both Plaintiffs complain about being instructed not to talk together or go to lunch together, and being required to get permission before leaving for lunch.

However, "not all conduct by an employer negatively affecting an employee constitutes adverse employment action." *Davis*, 245 F.3d 1232, 1238 (11th Cir. 2001) ("Title VII is neither a general civility code nor a statute making actionable the ordinary tribulations of the workplace"). To prove adverse employment action, "an employee must show a *serious and material* change in the terms, conditions, or privileges of employment." *Id.* at 1239. After reviewing the record, I conclude that viewed objectively, none of the actions the Plaintiffs complain about, either separately or collectively, rise to the level of an adverse employment action. *See generally Mitchell v. Pope*; 189 Fed.Appx. 911, 914 (11th Cir. 2006) (finding no constructive discharge where plaintiff resigned due to health problems and a dispute over her leave time, finding major's harassing behavior did not rise to level of a tangible employment action); *Fitz, supra,* at 979 (plaintiff cannot claim intolerable work conditions based on a mere suspicion that manager planned to fire plaintiff and intentionally caused plaintiff anxiety); *Hipp v. Liberty National Life Ins. Co.*, 252 F.3d 1208 (11th Cir. 2001) (finding that at most plaintiffs proved that management's style was harsh, confrontational, and at times offensive, and may or may not have been effective but that "it is not our place to tell employers how to run their businesses" but had not proved that their working environments had become so objectively intolerable that they had no choice but to resign); *Durley v. APAC, Inc.*, 236

F.3d 651, 658 (11th Cir. 2000); (affirming summary judgment for defendant where plaintiff could point only to negative comments regarding medically necessary absences and a smaller raise than that received by other employees); *Hill v. Winn Dixie Stores, Inc.,* 934 F.2d 1518, (11th Cir. 1991) (finding that reprimand and criticism by plaintiff's supervisors and withdrawal of customary support to plaintiff's department did not create intolerable working conditions that would compel a reasonable person to resign especially in light of short duration of time within which events occurred and in light of defendant's efforts to rectify the problems); *Lewis v. Michaels Stores, Inc.*, 2007 WL 2254502, *8 (M.D. Fla. 2007) ("while [manager's] alleged actions toward [plaintiff] were inappropriate and offensive, and this Court in no way condones his behavior, the facts on record are insufficient to present a jury question as to constructive discharge"). As in *Fitz*, viewing the facts in the light most favorable to the Plaintiffs, I am unable to conclude that a jury could find that the evidence in this case paints a picture of intolerable working conditions such that a reasonable person would have felt compelled to resign. *See also Brochu v. City of Riviera Beach*, 304 F3d 1144, 1155 (11th Cir. 2002) ("A constructive discharge claim does not present a jury issue unless a plaintiff produces substantial evidence that conditions were intolerable").

Moreover, the evidence before me fails to demonstrate that the Plaintiffs' resignations were the result of discriminatory conduct. The paperwork that McCarron prepared after Peterson called states that Peterson complained that the job required too many hours, and that she was treated rudely by Steve Barger (doc. 29, pp. 211, 216, 219, ex. 2). Likewise, Williams' stated reason for resigning was that she was not making enough money (doc. 25, p. 152). If the Plaintiffs believed that the working conditions had become intolerable because of discrimination based on their race or gender, they had a duty to put the employer on notice and give the employer an opportunity to rectify the problems. *See generally Kilgore v. Thompson & Brock Management, Inc.*, 93 F.3d 752, 754 (11th

Cir. 1996) ("A constructive discharge will generally not be found if the employer is not given sufficient time to remedy the situation."); *Garner v. WalMart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir. 1987) (noting that "while hurt feelings can form part of a constructive discharge scenario" ... "part of an employee's obligation to be reasonable is an obligation not to assume the worst, and not to jump to conclusions too fast"); *Williams v. City of Kansas City, Mo.,* 223 F.3d 749, 754 (8th Cir. 2000) ("It is difficult to find a employee's resignation objectively reasonable and subject an employer to liability for constructive discharge when the employee quits without giving her employer a chance to fix the problem.").

   *2. discrimination based on disparate treatment*

   Title VII provides that it is an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. §2000e-2(a). Section 1981 prohibits intentional racial discrimination in the making and enforcement of private contracts, including employment contracts. 42 U.S.C. §1981. Both Title VII and §1981 have the same analytical framework. *Patterson v. McLean Credit Union,* , 491 U.S. 164, 186 (1989) (elements of proof for demonstrating discrimination under Title VII and § 1981 are same); *Washington v. Kroger Co.*, 218 Fed.Appx. 822, 824 (11th Cir. 2007). There are two methods by which a plaintiff may prove discrimination: direct evidence and circumstantial evidence.

   *a. direct evidence*

   "Where the non-movant presents direct evidence that, if believed by the jury, would be sufficient to win at trial, summary judgment is not appropriate even where the movant presents conflicting evidence." *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997). Direct

evidence is evidence of discrimination that "if believed, would prove the existence of a fact in issue without inference or presumption." *Earley v. Champion Intern. Corp.*, 907 F.2d 1077 (11th Cir. 1990). Only the most blatant of remarks by an employer will qualify as direct evidence of discrimination. *Gibson v. Henderson*, 1998 WL 173188 (M.D. Fla. April 9, 1998)(citing *Earley*, 907 F.2d 1077 which noted that direct evidence of age discrimination may be present where an employer states "Fire [the plaintiff], he's too old.")). Evidence that only suggests discrimination or that is subject to more than one interpretation does not constitute direct evidence. *Merritt*, 120 F.3d at 1189.

Plaintiff Williams contends that a statement by the general manager at the time she was hired shows a discriminatory intent. She recalls the general manager told her in March 2006 that he wanted some "good, strong women" as salespersons. (doc. 25, p. 32). Far from being a statement showing discriminatory intent, this statement appears to indicate that Morse valued and was actively seeking women to work as salespersons. This certainly does not constitute direct evidence of discrimination. *See, e.g., Harris v. Shelby County Bd. of Educ.*, 99 F.3d 1078, 1083, n.2 (11th Cir. 1996) (holding that statement that "under the circumstances we did not need to employ a black at Thompson High School" open to more than one interpretation and thus not direct evidence). Plaintiffs also claim that on some occasions the salespersons exchanged distasteful "jokes" referencing blacks that Peterson thought inappropriate for the workplace. She did not complain to management about the jokes; irrespective, I find that they are stray remarks made by non-management employees and that the "jokes" are not evidence of discrimination (doc. 29, p. 246). *See e.g., Allen v. City of Athens,* 937 F. Supp. 1531, 1543 (N.D. Ala. 1996) citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (stray remarks in the workplace and statements by non-decisionmakers do not constitute direct evidence of discrimination). Peterson admits that Litton and

12

Barger never made any racially inappropriate comments to her (doc. 29, p. 148).

### b. circumstantial evidence

The *McDonnell-Douglas* burden-shifting framework, applied in evaluating Title VII and §1981 claims supported by circumstantial evidence, requires that Plaintiffs first make out a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981); *Combs v. Plantation Patterns,* 106 F.3d 1519, 1527-28 (11th Cir.) *cert. denied*, 118 S. Ct. 685 (1997). Establishing the *prima facie* case creates a presumption that the employer unlawfully discriminated against the employee. If Plaintiffs establish a *prima facie* case, the burden then shifts to Defendant to produce a legitimate, nondiscriminatory reason for the challenged employment action. *McDonnell Douglas*, 411 U.S. at 802. To satisfy that burden of production, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine*, 450 U.S. at 254-55. "[T]o satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Id*. at 257 (emphasis added). If Defendant carries its burden of producing a legitimate, nondiscriminatory reason for its decision, the presumption of discrimination created by the *McDonnell Douglas* framework "drops from the case," and Plaintiffs must then demonstrate that the proffered reasons for Defendant's actions were mere pretext for its discriminatory actions. In other words, Plaintiffs have the opportunity to come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable fact finder to conclude that the reasons given by Defendant were not the real reasons for the adverse employment decision. *Id*.; *McDonnell Douglas*, 411 U.S. at 804.

To set forth a *prima facie* case of discrimination based on disparate treatment, the Plaintiffs must show: (1) that they belong to a protected class; (2) that they were subjected to an adverse employment action; (3) that their employer treated similarly situated employees outside the classification more favorably; and (4) that they were qualified to do the job. *Holifield v. Maynard*, 115 F.3d 1555, 1562 (11th Cir. 1997). The Plaintiffs' failure to establish an adverse employment action, set forth above, is fatal to their claims. *See Davis, supra,* at 1246) ("adverse employment action is an indispensable element of a Title VII plaintiff's case"); *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir.1998) ("Although a plaintiff's burden in proving a *prima facie* case is light, summary judgment against the plaintiff is appropriate if he fails to satisfy any one of the elements of a *prima facie* case.").

Even assuming, however, that Plaintiffs suffered adverse employment actions, they still fall short of alleging *prima facie* cases of discrimination based on disparate treatment because they have not shown that their employer treated similarly situated employees outside their classification more favorably than themselves. To satisfy this element, Plaintiffs must show that they and the comparator employees were similarly situated in all relevant aspects. *Holifield, supra*, 115 F.3d at 1562; *Marshall v. Western Grain Co., Inc.*, 838 F.2d 1165, 1168 (11th Cir. 1988) (crucial to analyze carefully whether the comparator employees are similarly situated). Plaintiffs' analysis should include an evaluation of whether they were "… matched with a person or persons who have very similar job-related characteristics and who are in a similar situation to determine if the [Plaintiffs were] treated differently than others who are similar to [them]." *See also Cooper v. Southern Co.*, 390 F.3d 695, 745 (11th Cit. 2004) (finding plaintiff failed to establish a *prima facie* case where she alleged that she was paid less that similarly situated white employees, but failed to establish that the proposed comparators had similar levels of experience or education or job responsibilities with any

particularity); *Harper v. Ulta Salon Cosmetics & Fragrance*, 2007 WL 528088 (N.D. Ga. Feb. 13, 2007) (finding plaintiff did not make out *prima facie* case of discrimination where she failed to identify white employees who were treated better or benefitted from her termination); *Piquion v. Walgreen Co.*, 369 F.Supp.2d 1339, 1246 (S.D. Fla. 2005) (concluding that plaintiff could not establish a *prima facie* case where plaintiff "offers nothing more than conclusory statements that no other employee was treated the same way" and "fails to specifically identify an employee for the Court to consider when evaluating his claim"); *LeBlanc v. TJX Cos., Inc.*, 214 F.Supp.2d 1319, 1326 (S.D. Fla. 2002) (finding comparator argument conclusory where plaintiff "fails to indicate specific instances or individuals to support his assertions").

Plaintiffs complain generally that sales were taken away or that management failed to help them out with sales or getting customers, but provide little or no details in this regard. Aside from their own depositions, Plaintiffs have presented no evidence showing that other car salespersons were treated more favorably.[3] Williams argues that "Matt" received more support than she did, and Peterson says that Litton had a practice of ordering cars for other salesperson's clients but not hers. These arguments fall short. Williams herself attributed "Matt's" special treatment to the fact that "Matt" was good friend's with Litton's family and that it was "almost like having your son work for you" (doc. 25, pp. 76, 78). And Peterson failed to provide any facts to bolster her complaints of unfairness. Moreover, Williams acknowledged that "most of the men . . . had been there for a while, for years. And that's one of the reasons what made me want to apply there and join the company, because a lot of people had been there eight years plus" (doc. 25, p. 53). These persons could hardly

---

[3] In *Maynard v. Board of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003), the Eleventh Circuit found that summary judgment for defendant was proper where the plaintiff brought forth no evidence absent his deposition to show that other residents in the surgical residency program were treated more favorably.

be considered valid comparators when Peterson and Williams were both new to their jobs.

Further, even if Plaintiffs could establish that one or more of the other salespersons were valid comparators, they have failed to show how the other salespersons received more favorable treatment under similar circumstances. *Wehunt v. R.W. Page Corp.*, 352 F.Supp. 2d 1342, 1352 (M.D. Ga. 2004). *See also Burke-Fowler v. Orange County, Fla.* 447 F.3d 1319, 1323 (11th Cir. 2006) ("When a plaintiff alleges discriminatory discipline, to determine whether employees are similarly situated, we evaluate 'whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways.' . . .When making that determination, '[w]e require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.'"). Although Williams surmises that Olds was not written up for being late, she admits she did not know whether he had been given permission to be tardy (doc. 25, p. 151). Thus, Williams has not shown that Olds was similarly situated, as it's impossible to tell whether he was involved in similar conduct and was disciplined in a different way.  Likewise, Peterson testified that Morse's management discriminated against her by failing to assist her in finding cars for customers and in unfairly denying her commissions, but she was unable to show any comparators who received more favorable treatment under similar circumstances.

Without proper comparators, Plaintiffs cannot establish a *prima facie* case of disparate treatment, and therefore it is unnecessary to proceed to evaluate Morse's evidence as Morse is entitled to summary judgment. *Holifield, supra* at 1562 ("If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present."). Moreover, in a disparate treatment case, a plaintiff must prove discriminatory animus. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 256

(1981). Plaintiffs fail to do so in this case. Peterson testified that she assumed race may have been the reason Lewkewicz did not want to help her because she did not know of any other reasons for his conduct (doc. 29, p. 107), and Williams testified that she does not know why Litton failed to support her as he did her co-worker Matt, but that she cannot think of any other reason aside from that she is black and female (doc. 25, p. 80). *See Ramsey v. Leath*, 706 F.2d 1166, 1170 (11th Cir. 1983) (affirming district court's summary judgment for defendant where plaintiff failed to present any evidence of discrimination beyond their subjective beliefs which alone did not constitute a material issue).

### 3. Plaintiff's state claims

For the reasons already discussed, I find summary judgment for Morse appropriate with regard to Plaintiffs' Florida Civil Rights Act claims. *See Harper v. Blockbuster Entertainment Corp.*, 139 F.3d 1385 (11th Cir. 1998) ("The Florida courts have held that decisions construing Title VII are applicable when considering claims under the Florida Civil Rights Act, because the Florida act was patterned after Title VII.").

### D. Conclusion

The core of Plaintiffs' claims is that the white male car salespersons were given more support and were not subject to the same rules as they were, and they suffered because of it. The role of this Court is to address whether illegal discriminatory motive underlies a challenged employment decision. It is not "to act as a super personnel department that second guesses employers' business judgments". *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1092 (11th Cir. 2004) (quoting *Lee v. GTE Fla., Inc.* 226 F.3d 1249, 1254 (11th Cir. 2000). While one may sympathize with Plaintiffs' plights, they have not produced sufficient evidence to support their naked claims that Morse treated them differently due to their gender or race. Accordingly, after consideration, it is hereby

17

ORDERED that:

1.  Defendant's motion for summary judgment (doc. 24) is GRANTED.

DONE AND ORDERED at Tampa, Florida on January 18, 2008.

*/s/ Mark A. Pizzo*
MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE